IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Submitted on Briefs September 19, 2006

## IN RE I.C.G., B.M.D., T.N.C., & T.L.C.

**Appeal from the Juvenile Court for Hamilton County**
**No. 192214-18    Suzanne Bailey, Judge**

---

**No. E2006-00746-COA-R3-PT - FILED OCTOBER 31, 2006**

---

In this appeal, S.L.B. ("Mother") contends that the trial court erred in terminating her parental rights to four of her five children. Mother does not challenge the propriety of the trial court's order terminating her parental rights as to the fifth child. After careful review of the evidence and applicable authorities, we hold that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that termination of Mother's parental rights was in the best interest of her children. Therefore, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL PICKENS FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Robert B. Pyle, Chattanooga, Tennessee, for the Appellant, S.L.B.

Paul G. Summers, Attorney General and Reporter, and William N. Helou, Assistant Attorney General, Nashville, Tennessee, for the Appellee, State of Tennessee, Department of Children's Services.

## OPINION

### *I. Background*

This case involves the termination of Mother's parental rights to five of her children.[1] Imari G. (born September 13, 1991) is the son of Anthony G., who is deceased. Bre'Ana D. (born March 1, 1993) is the daughter of Michael D. The remaining three children, Tyrone C., Jr., ("Tyrone Jr.") (born July 30, 1999), Tyshaila C. (born December 3, 2000), and Tyonna C. (born July 7, 2002), were fathered by Tyrone C., Sr. ("Tyrone Sr."). The Department of Children's Services ("DCS") is not seeking termination of the parental rights of Michael D. and Tyrone Sr. and is continuing to provide services to them.

On May 4, 2002, Mother brought Tyrone Jr. to the emergency room of T.C. Thompson Children's Hospital in Chattanooga. The child was treated for second-degree burns on the tops and sides of his feet, his left elbow, his left buttock, and part of his back. He also had first-degree burns on his shoulders. According to Mother, who was approximately seven months pregnant at the time of the incident, she was taking a nap around 11 a.m. on either May 1 or 2, 2002,[2] when she awoke to the sound of Tyrone Jr. screaming. Mother said that she found the two-year-old in the bathtub, and he had been burned by hot water in the tub.[3] Mother testified that her elderly grandparents were supposed to be watching the children while she slept.[4] Tyrone Jr.'s pediatrician reported that Mother called him late on the night of May 3, 2002, to request a prescription for ointment to treat the burns, and then brought the child to his office the following morning. Mother was told to take Tyrone Jr. to the emergency room, which she did that same day. Doctors told DCS that the burns on Tyrone Jr.'s body were not water burns. Mother had previously been investigated by DCS because of burns on Bre'Ana D. and bruises on Tyrone Jr.

On May 8, 2002, the Juvenile Court of Hamilton County entered a protective custody order which vested DCS with temporary custody of Imari G., Bre'Ana D., Tyrone Jr., and Tyshaila C. The court found probable cause to believe that the children were dependent and neglected based on the severe injuries sustained by Tyrone Jr. while in his Mother's care. On July 9, 2002, the trial court entered a protective custody order regarding Tyonna C., then two days old, and placed her in the care of DCS based upon the same episode of alleged abuse.

---

[1] Since DCS filed its Petition to Terminate Parental Rights on May 19, 2004, Mother has given birth to two additional children, Jomanna and Jacob. Both children were removed from Mother's custody shortly after their birth and placed in the custody of DCS. Mother's parental rights to these two children are not at issue in this case. At the time the trial court rendered its judgment on February 24, 2006, Mother was pregnant with her eighth child.

[2] According to the record, Mother is unable to remember the exact date of the incident.

[3] A test of the water temperature in Mother's apartment indicated that the water could get as hot as 151 degrees.

[4] Tyrone Sr., Mother's husband and the father of three of the children at issue in this case, was incarcerated for domestic violence at the time of Tyrone Jr.'s injury.

DCS drafted permanency plans for the children.[5] Mother signed the permanency plans for her four oldest children on June 20, 2002, noting that she did not agree to the requirement that she "admit to child abuse or any other criminal conduct." The permanency plan for the infant, Tyonna C., was not signed by Mother. There is no indication in the record as to why she did not sign the final permanency plan, which was developed in September of 2002. However, the requirements for Tyonna C.'s plan were essentially the same as those of the other four children.

On September 9, 2003, the trial court found Mother's five children to be dependent and neglected. Furthermore, the court entered a finding of severe abuse against Mother, stating that clear and convincing evidence persuaded the court that Mother had intentionally inflicted Tyrone Jr.'s burns. The trial court's findings were affirmed by the Circuit Court of Hamilton County.

On April 14, 2004, the trial court terminated Mother's visitation because of Mother's inappropriate behavior during supervised visits with her children. During one of the visits, Mother lost her temper, and DCS had to call security to remove Mother from the premises. The following month, DCS filed a petition to terminate the parental rights of Mother on the grounds that Mother abandoned the children by willfully failing to support them; Mother committed severe abuse against Tyrone Jr.; Mother failed to substantially comply with the permanency plans drafted by DCS; the children have been removed from Mother's home by court order for more than six months and the conditions which led to the removal persist and are unlikely to be remedied in the near future, and the continuation of the mother/child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home; and Mother was sentenced to more than two years' imprisonment for conduct against Tyrone Jr.[6] DCS further asserted that the termination of Mother's parental rights would be in the best interests of her five children.

The trial court granted a default judgment to DCS on September 26, 2005, because Mother failed to appear in court and did not provide an excuse for her absence. Mother's attorney filed a motion to set aside the default judgment, which the trial court denied when Mother once again failed to appear in court for the motion hearing. Mother's attorney filed a second motion to reconsider the termination, which was granted on November 9, 2005.

Following a bench trial, the court entered a Termination of Parental Rights and Final Decree of Complete Guardianship on February 24, 2006. The trial court found, by clear and convincing

---

[5]The permanency plans required, among other things, that Mother: undergo a parenting assessment; complete a psychological examination; actively participate in any counseling recommended as a result of the pyschological assessment and attend such counseling until all treatment goals have been met; complete counseling designed to deal with domestic abuse issues; admit to abusing her children; have gainful, stable employment for at least six months prior to her children returning home; provide a safe, clean, and stable home for her children; cooperate with all DCS case workers and other professionals assigned to work with her; and pay child support to the state in accordance with current guidelines.

[6]Mother pleaded guilty to attempted aggravated child neglect, for which she received a ten-year sentence. The Criminal Court of Hamilton County suspended Mother's sentence and placed her on active probation.

evidence, all of the grounds for termination of Mother's parental rights alleged by DCS with the exception of abandonment by failure to pay child support.[7]  Furthermore, the court found by clear and convincing evidence that it was in the best interests of the children that Mother's parental rights be terminated.  Mother appeals.

## II.  Issue

The sole issue raised by Mother on appeal is whether the trial court was correct in finding, by clear and convincing evidence, that termination of her parental rights was in the best interest of Imari G., Bre'Ana D., Tyshaila C., and Tyonna C.  Mother did not appeal the trial court's finding that termination of her parental rights to Tyrone Jr. was in that child's best interest.

## III.  Standard of Review

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions.  *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001).  Although this right is fundamental and superior to claims of other persons and the government, it is not absolute.  *State v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004).  This right continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002).  Although "parents have a fundamental right to the care, custody, and control of their children," this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute.  *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645 (1972)).

Termination proceedings are governed by statute in Tennessee.  Parties who have standing to seek the termination of a biological parent's parental rights must first prove at least one of the statutory grounds for termination.  Tenn. Code Ann. § 36-1-113(c)(1).  Secondly, they must prove that termination of the parent's rights is in the child's best interest.  Tenn. Code Ann. § 36-1-113(c)(2). Because the decision to terminate parental rights has profound consequences, courts must apply a higher standard of proof in deciding termination cases. Therefore, to justify termination of parental rights, the party seeking termination must prove by clear and convincing evidence the ground (or grounds) for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W. 3d 539, 546 (Tenn. 2002).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions.  *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.*,

---

[7]The trial court stated that "because of Mother's pregnancies with children who are not the subject of this action and claims of inability to work during those pregnancies, the Court does not find clear and convincing evidence of abandonment by failure to pay child support."

980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed Aug. 13, 2003), *no appl. perm. filed*, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In a non-jury case such as this one, we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless the evidence preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.,* 984 S.W.2d 912, 915 (Tenn. 1999). Further, "[o]n an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings." *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990) (citing *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488, 490 (Tenn. Ct. App. 1974)). The trial court's specific findings of fact are first reviewed and are presumed to be correct unless the evidence preponderates against them. We then determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for terminating the biological parent's parental rights. *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). The trial court's conclusions of law are reviewed *de novo* and are accorded no presumption of correctness. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

## *IV. Analysis*

Mother asserts that the trial court erred in finding that termination of her parental rights is in the best interest of Imari G., Bre'Ana D., Tyshaila C., and Tyonna C. Tennessee law provides that a court shall consider the following factors when determining whether termination of parental rights is in the best interest of a child:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services

-5-

agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent and guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activitiy in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). The factors enumerated above are not exhaustive, and "[t]he statute does not require every factor to appear before a court can find that termination is in a child's best interest." *Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-PT, 2002 WL 970434, at *3 (Tenn. Ct. App. M.S., filed May 10, 2002).

The trial court heard testimony from several witnesses, including DCS employees, mental health professionals, friends of Mother, and Mother herself. After considering all of the evidence, the court found by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the children. Specifically, the court found that:

- The children had been removed from Mother's custody by order of the court for at least six months before the hearing, and Mother "failed to make any adjustment of circumstance, conduct or conditions to make it safe and in the Children's best interest to be placed in her care." See Tenn. Code Ann. § 36-1-113(i)(1).

- Despite assistance from DCS, "there is no evidence that [Mother] can provide a home in which the Children will be safe from the threat of certain emotional and psychological and very likely physical harm caused by the Mother's tendency to engage in violent relationships and her untreated personality disorders." See Tenn. Code Ann. § 36-1-113(i)(2), (7), (8).

- The children "were taken from the Mother at such a tender age that no meaningful parent-child relationship exists between them and their mother." See Tenn. Code Ann. § 36-1-113(i)(4). Imari G. indicated that he wanted to remain with his foster family rather than returning to Mother. Bre'Ana D. told Dr. Tom Biller, one of the pyschiatrists who counseled the children after they were placed with DCS, that if she (Bre'Ana) were a parent, it would be wrong to treat her children like Mother treated her.

- A change of caretakers and homes is likely to have a negative effect on the children. See Tenn. Code Ann. § 36-1-113(i)(5). The trial court emphasized that the children have been in foster care for four years during the pendency of this proceeding, yet "they have achieved an amazing level of permanency despite this lengthy process." The court expressed concern that "[i]t is highly unlikely that other such good opportunities for permanency will be available if full advantage is not taken of these right away." Finally, the court noted that continuation of Mother's parental relationship with the children "greatly diminishes the Children's chances of early integration into a stable and permanent home."

- Because of Mother's antisocial personality disorder, Mother "cannot provide a safe environment for the Children and she will not change." See Tenn. Code Ann. § 36-1-113(i)(8). The trial court reiterated testimony from Dr. Bertin Glennon, the psychiatrist who conducted a parenting assessment of Mother, that "[Mother's] personality disorder will cause her to consistently fail to follow the normal process of thinking for a mother and that the condition will not change." The court emphasized that none of the mental health service providers who testified would recommend that custody of the children be restored to Mother.

While discussing the statutory grounds for terminating Mother's parental rights, the trial court called attention to its earlier finding that Mother had committed severe child abuse against

Tyrone Jr. That finding, which was affirmed by the Circuit Court of Hamilton County, is also relevant in the best-interest analysis. See Tenn. Code Ann. § 36-1-113(i)(6).

Mother argues that the trial court "hardly carried the day on best interests of the children, much less by clear and convincing evidence." We disagree. There is ample evidence in the record to support the trial court's findings. Certainly the history of child abuse in Mother's household would raise concerns about the health of these children, should they be returned to Mother. There was also a history of domestic violence between Mother and her partners. Mother testified that she had been in three abusive relationships in her lifetime, one of which is with her current husband, Tyrone Sr., who is also the father of three of the children at issue in this case. Mother was diagnosed with personality disorders by two mental health professionals, and the court stated that it witnessed symptoms of Mother's antisocial personality disorder while she was testifying. Furthermore, there is evidence that Mother's parenting ability will be impaired because of her mental health condition.

Three case managers from DCS testified that they would not recommend that Mother be allowed to have custody of her children. They described her temper tantrums during visits with her children and a general uncooperative attitude when she interacted with DCS employees. In fact, Mother's behavior during visits was so extreme and so upsetting to her children that the court terminated her visitation. Mother was also uncooperative during her parenting assessment and did not complete the counseling that was required as part of her permanency plan. She failed to pay child support and testified that she does not want to get a job because she is trying to get disability payments. This suggests that she might not be able to support her children, even if they were returned to her care.

Although a parent's right to the care and custody of her children is a fundamental liberty interest protected by both our state and federal constitutions, a parent's interest must yield to that of her children. After careful review, we must conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that termination of Mother's parental rights is in the best interest of Imari G., Bre'Ana D., Tyshaila C., and Tyonna C.

### V. Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed. This case is remanded to the trial court for enforcement of the trial court's judgment terminating Mother's parental rights to Imari G., Bre'Ana D., Tyshaila C., and Tyonna C. and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are adjudged against the Appellant, S.L.B.

_____
SHARON G. LEE, JUDGE